J-S10032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARIA DULNUAN N/B/M MARIA KETNER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIAM DROBNAK | : | |
| | : | No. 1713 MDA 2025 |
| Appellant | : | |

Appeal from the Order Entered October 16, 2025
In the Court of Common Pleas of Lancaster County
Civil Division at No: CI-18-06790

BEFORE: DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: APRIL 20, 2026**

William Drobnak (Father) appeals from the order which modified the parties' custody of A.D. (Child) and found Father in contempt of four prior custody orders. We affirm.

Child was born in March 2012 to Father and Maria Dulnuan n/b/m, Maria Ketner (Mother). Mother and Father have been litigating custody of Child for the past eight years. The trial court recounted the procedural history, which is relevant to this appeal, as follows:

Mother filed her initial custody complaint on August 14, 2018, seeking sole legal and physical custody of [C]hild. After a hearing, the [c]ourt issued a Final Custody Order dated May 31, 2019. In issuing the order, the [c]ourt explicitly found no history of child abuse but noted that Father had made numerous reports to Protective Services and filed a [protection from abuse action] against Mother's fiancé (now husband) on behalf of [C]hild. The [c]ourt also observed that all reports were unfounded and that [C]hild had admitted being coached by Father regarding

allegations of abuse against Mother's fiancé. Additionally, the [c]ourt stated that Father had an extensive history of drug abuse, lacked a driver's license, and had convictions for driving without a license, forgery, retail theft, and receiving stolen goods. The [c]ourt further noted that Father claimed to have suicidal ideations since separating from Mother and had threatened Mother's fiancé.

On September 1, 2020, Father filed a Petition for Modification. In his petition, Father reiterated allegations of child sexual abuse involving Mother's fiancé. He also claimed that Mother's two older sons physically abused [C]hild. Additionally, a report of suspected child sexual abuse was made to the Lancaster County Children and Youth Social Service Agency on October 5, 2020. This report led to the implementation of an immediate Primary Safety Plan, which prohibited Mother's fiancé from having any contact with [C]hild for sixty days. Mother and her fiancé were notified by letter dated October 27, 2020, that the report was deemed unfounded.

After a conference on Father's Petition ended without agreement, the [c]ourt issued a Recommended Order on October 27, 2020, setting a hearing for January 25, 2021, and maintaining the Order dated May 31, 2019. The hearing was later postponed to April 22, 2021, due to court closures. In the meantime, Mother filed a Petition for Contempt on January 4, 2021, claiming that Father failed to turn over [C]hild at 2:45 p.m. on Christmas Day to start her holiday custody period.

A hearing was held on both petitions on April 22, 2021…. At the end of the hearing, the [c]ourt found no reason to modify the main terms of the custody order based on Father's inability "to understand and abide by the terms of any order, better regulate his conduct, and accept responsibility for his actions[.]" [Trial] Court Opinion, 4/27/21, at 12. The [c]ourt also found Father in contempt for knowingly, intentionally, and willfully failing to follow the [c]ourt's order from May 31, 2019. As a result, Father was ordered to pay Mother $300 in attorney's fees.

On August 2, 2022, Mother filed a Petition for Emergency Relief and Contempt, alleging that first, Father sent a text to Mother stating he would keep [Child] for four extra days, and second, on the day he was supposed to return [Child], he sent another text saying he would not be returning [C]hild at all. At the time of the petition, Father had [Child] for 21 days. A conference was held on September 20, 2022…. The parties reached an agreement [for

Father to have partial physical custody every other weekend], which was incorporated into a final order on September 22, 2022.

On June 5, 2023, Mother filed a Petition for Modification of a Custody Order and Contempt. In the new petition, Mother stated that Father picked up [Child] on May 26, 2023, for his custodial weekend. She reported that on or about May 27, 2023, she received a visit from Children and Youth Services ("CYS") regarding allegations against her [former fiancé, who was now her] husband. Additionally, Mother alleged that on May 28, 2023, Father failed to bring [C]hild to their agreed-upon transfer location. The petition further stated that [Child] was not in school on May 30, 2023. Mother claimed she was informed by [Child's] school on May 31, 2023, that she could not pick up [Child] due to the CYS investigation. On June 13, 2023, the [c]ourt issued an order for the parties to follow the safety plan put in place by CYS. The order placed no limitations on Mother's contact with [Child].

On June 16, 2023, Mother filed a Petition for Interim Relief claiming that Father failed to return [Child] and requesting the [c]ourt to order Father to return [Child] immediately and to instruct law enforcement to help enforce the order. An Order dated June 26, 2023, granted the requested relief and directed Father to return [Child] to Mother by 7:00 p.m. on the same date.

On June 27, 2023, Mother filed another Petition for Interim Relief, alleging that on or about June 26, 2023, Father refused to return [Child] as ordered by the [c]ourt. By Orders dated June 29, 2023, a Custody Contempt hearing was scheduled for July 24, 2023, and Father was directed to return [Child] by 12:00 noon on June 29, 2023.

On July 24, 2023, the [c]ourt scheduled the contempt hearing to be consolidated with Mother's Petition for Modification filed on June 5, 2023. Meanwhile, Father was ordered to have supervised visits with [Child] once a week, supervised by Child First Family Services ("Child First"), with Father responsible for the costs. Additionally, Father agreed to withdraw his Protection From Abuse Petition filed on behalf of [Child] at docket CI-23-03690.

After a series of continuances and conferences, a custody pretrial conference was held on September 5, 2025, and a trial occurred on September 30, 2025.

Trial Court Opinion II (TCO II), 12/19/25, at 1-4.  At trial, the court heard testimony from Mother, Father, Child, and Mother's husband, Roland Ketner (Stepfather).[1]

Mother testified to being employed full-time as a cleaner for a commercial business.  N.T., 9/30/25, at 24.  She relayed that she and Stepfather had been married for seven years. *Id.* at 35.  As to Child, Mother stated that Child was safe and had never been abused. *Id.*  She testified that at the time of trial, Child was 13-years-old and doing well in 8th grade. *Id.* at 20, 28-29.

Mother explained that in the summer of 2024, Father had encouraged Child to run away. *Id.* at 43.  Mother stated that she was reunited with Child after she was contacted by police and learned that Father's mother had taken Child to a local police station. *Id.* at 52.  Mother described Father as having issues with "anger management." *Id.* at 36.  She recalled Father approaching her in public and asking her to "give me back my son," and offering her $20,000 to do so. *Id.* at 23.  Mother testified, "I said contact my lawyer.  And he kept talking to me, following me.  I said please call my lawyer." *Id.*  Mother

---

[1] Although the trial docket indicates that Father's counsel ordered the trial transcript, it is not in the certified record. *See* Pa.R.A.P. 1921, note ("An appellate court may consider only the facts which have been duly certified in the record on appeal").  However, we consider the undisputed copy of the transcript in Father's reproduced record. *See Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (Supreme Court considering a transcript "contained only within" the reproduced record, where "the accuracy of the reproduction has not been disputed and, thus, we may consider it.").

stated that she called the police after the incident because she was scared. ***Id.*** at 24.

Mother testified that Child loves Father, but stated that she did not know whether Child wanted to see Father. ***Id.*** at 33. According to Mother, Father has spent years trying to turn Child against her. ***Id.*** at 37. Mother expressed that she "just want[s Father] to be a dad, to … teach [Child] … something good…, not, like, teach him lying, stuff like that." ***Id.*** at 51.

Finally, Mother confirmed she had filed numerous contempt petitions due to Father's repeated failure to comply with the orders requiring him to return Child when his periods of partial custody concluded. ***Id.*** at 33-34. Mother testified that she had to withdraw money from her 401(k) retirement plan to pay the attorney's fees she incurred as a result of the contempt actions. ***Id.*** at 34.

Father testified that he was unemployed due to a work injury, and that Child is his only child.[2] ***Id.*** at 70, 76. Father stated:

> Basically, this has been going on roughly the last seven, eight years. Everything that I've done up until now was for [Child]. Don't really have a whole lot to say, but like I said, everything that has been going on up until now I've done for [Child].
>
> I've never told [C]hild to lie. I've never told him to do anything that was wrong or illegal or anything. I haven't talked to [Child] in almost two years[,[3]] except for one time when he called me

---

[2] Father is represented by counsel on appeal, but appeared *pro se* at trial.

[3] In his brief, Father states that his "supervised visits continued until December 2024, when he was discharged from Child First." Father's Brief at 10.

because he was crying because he had to go with [Stepfather] on a company picnic, and [Child] told me that [Stepfather] slapped him in his face because he was eating watermelon with a spoon. … But other than that I haven't talked to [Child].

I have never told [Child] to do anything wrong. I've never told him to lie. I miss [Child]. I wish I could be with [him], and I'm pretty sure he wishes he could be with me.

*Id.* at 59.

On cross-examination, Father stated that he believed in following court orders "for the most part." *Id.* at 64. Father conceded that he had a criminal history which included convictions of driving without a license and summary harassment. *Id.* at 68. He also admitted to being charged with interfering with a custody order, a third-degree felony, as a result of the incident that occurred with Child and the police in the summer of 2024. *Id.* at 66. Father testified that he pled guilty to a reduced charge in that case. *Id.* In response to further questions, Father stated to Mother's counsel:

You and [Mother] ha[ve] been trying to get me in trouble left and right. You've been covering for her left and right. And, quite frankly, I want to know why you feel that you need to help her to try to keep [C]hild away from me. What have I done so wrong to where I'm not allowed to be with [C]hild or anything?

*Id.* at 71.

The parties agreed to the trial court interviewing Child in chambers "without parents or counsel present." Trial Court Opinion I (TCO I), 10/16/25, at 8. Child expressed being anxious, and explained that when he had testified in prior proceedings, "the judge would ask me questions and … after we were done talking, he would go out into the room and say everything that I told

- 6 -

him." N.T. at 108-09.[4] Child stated, "I just don't want it to be a big mess." *Id.* at 104.

Stepfather testified to working full-time as a general manager for a local company. *Id.* at 130-31. He stated that he had been accused of abusing Child "30 or 40 times." *Id.* at 131. He also stated that none of the accusations resulted in findings of abuse or criminal charges. *Id.* at 131-32. Stepfather denied abusing Child, and described Child as "very safe in our home." *Id.* at 134. Stepfather said, "I think it's like an obsession [Father has] for me." *Id.* at 135.

On October 16, 2025, the trial court entered an order and opinion (TCO I). The order provided:

> 1. Mother and Father shall share legal custody of [Child].
>
> 2. Mother is granted primary physical custody of [Child].
>
> 3. Father is granted supervised partial physical custody of [Child] one (1) time per week for up to three (3) hours through Child First Family Services or another agreed-upon professional child custody supervision service at Father's cost and expense.
>
> 4. Father shall have one (1) phone/video/FaceTime call with [Child] per week for up to twenty (20) minutes.
>
> 5. Father is found in contempt of court for knowingly, intentionally, and willfully failing to abide by the terms of the Orders dated September 22, 2022, June 13, 2023, June 26, 2023, and June 29, 2023.

---

[4] The trial court advised Child it did "not intend to go out there and say everything that you've said. That's not what I'm planning to do today." *Id.* at 105.

6. As a consequence of his contempt, Father shall pay Mother $500.00 toward attorney's fees incurred by Mother as a result of Father's conduct.

7. The full amount shall be paid within three (3) months of the date of this order.

TCO II at 4-5.

Father timely filed a notice of appeal, followed by a concise statement of errors complained of on appeal.[5]  Father presents the following questions for review:

[1.]   Did the trial court commit an abuse of discretion in issuing the final custody order of October 16, 2025 in this matter as it made findings not supported by competent evidence, made inferences and deductions wholly unsupported by the record, and reached unreasonable conclusions that were not in the best interest of [C]hild?

[2.]   Did the trial court commit an abuse of discretion in finding Father in contempt of court as he did not act with wrongful intent?

Father's Brief at 8.

In his first issue, Father claims the trial court abused its discretion in awarding Mother primary physical custody and limiting his partial custody to one weekly supervised visit and one weekly supervised phone call.  *See id.* at 19.  Father argues:

The trial court made findings not supported by competent evidence, made inferences and deductions wholly unsupported by

---

[5] Although Father did not file his concise statement with his notice of appeal pursuant to Pa.R.A.P. 1925(a)(2), we consider the later filing to be sufficient to preserve his appellate issues.  *See In re K.T.E.L.*, 983 A.2d 745, 747 n.1 (Pa. Super. 2009) (holding appellant's failure to simultaneously file a concise statement did not result in waiver where appellant subsequently filed the statement and there was no allegation of prejudice from the late filing).

the record, and reached unreasonable conclusions that were not in the best interest of [Child]. Specifically, the trial court ignored testimony from [Child] that he was subject to abuse in Mother's home[,] and made a finding that Father encouraged [Child] to run away from Mother's home[,] with no competent evidence supporting such a finding and with Father having no contact with [Child] at the time he ran away.

*Id.* at 19.[6]

This Court reviews a trial court's custody determination for an abuse of discretion. The law is well-settled:

We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Wilson v. Smyers*, 284 A.3d 509, 515 (Pa. Super. 2022) (citation omitted).

In custody matters, the "paramount concern is the best interests of the [child] involved." *A.L.B. v. M.D.L.*, 239 A.3d 142, 148 (Pa. Super. 2020) (citation omitted). When ordering any form of custody, a court must determine the best interest of the child by considering relevant statutory factors, and giving substantial weighted consideration to specific factors that affect the safety of the child. *See* 23 Pa.C.S. § 5328(a). "This Court defers to the credibility determinations of the trial court with regard to the witnesses

_____

[6] Mother has not filed an appellate brief.

- 9 -

who appeared before it, as that court has had the opportunity to observe their demeanor." **Harcar v. Harcar**, 982 A.2d 1230, 1236 (Pa. Super. 2009) (citations omitted). Pertinently,

> the discretion a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

At the conclusion of trial, the trial court stated, "I will evaluate all of the evidence in the case and give it all the weight that I feel that it's due." N.T. at 129. The court subsequently and properly considered the statutory factors set forth in 23 Pa.C.S. § 5328(a), "as they relate to [Child's] best interests in this case." TCO I at 10-15; **see also** TCO II at 6-12. The court found Mother and Stepfather to be credible. TCO I at 10. In contrast, the court noted "a plethora of abuse claims made by Father that ultimately were all either screened out or unfounded," and deemed "Father's account of the circumstances surrounding [Child] running away lacking in credibility in light of all the testimony from Mother, Father, and [Child]." **Id.** at 10-12. The court concluded that "Father's behavior suggests he is unlikely to support or facilitate regular contact with Mother," while "Mother is requesting that Father be granted professionally supervised time with [Child]." **Id.** at 12. The court further explained:

The [c]ourt is constrained to enter an order affording Father professionally supervised partial physical custody due to Father's demonstrated history of repeated refusals to follow [c]ourt orders and stated intention at the hearing to disobey [c]ourt orders again if Father deems it necessary. Father's lack of insight into the impact of his behavior on [Child] and their relationship is also extremely troubling. [Child] enjoys spending time with Father, but unfortunately, Father's behavior requires certain limitations on their time together. Over time, [Child] may come to understand how Father's choices have impacted their relationship.

*Id.* at 15.

The record supports the trial court's findings and reasoning. Accordingly, the court did not abuse its discretion by awarding Mother primary physical custody and limiting Father's partial custody to one weekly supervised visit and one weekly supervised phone call.

In his second issue, Father argues that the trial court abused its discretion by finding him in contempt of the orders which directed his compliance in returning Child to Mother. Father's Brief at 27. Father acknowledges he was aware of the orders and his actions were "volitional." *Id.* However, he maintains "he did not act with wrongful intent as he believed it was necessary to protect" Child. *Id.* at 27-28.

When considering an appeal from a contempt finding, "our scope of review is narrow: we will reverse only upon a showing that the trial court abused its discretion." *Harcar*, 982 A.2d at 1234 (citations omitted). The trial court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason. *Id.* This Court has explained:

Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's

- 11 -

authority and prevents the administration of justice from falling into disrepute. When reviewing an appeal from a contempt order, the [appellate] court must place great reliance upon the discretion of the trial judge.

*Id.* at 1235 (citations omitted).

A party who willfully fails to comply with any custody order may be found in contempt. 23 Pa.C.S. § 5323(g)(1). To sustain a contempt finding, the moving party must prove: (1) the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) the act constituting the contemnor's violation was volitional; and (3) the contemnor acted with wrongful intent. *Stahl v. Redcay*, 897 A.2d 478, 489 (Pa. Super. 2006). When determining whether a party acted with wrongful intent, the trial court "should use common sense and consider context[;] wrongful intent can be imputed to a [party] by virtue of the substantial certainty that his actions will violate the court order." *Gross v. Mitz*, 284 A.3d 479, 493 (Pa. Super. 2022) (citation omitted).

The trial court properly imputed wrongful intent to Father. The court noted Father's admission to violating multiple orders, and found "Father's conduct was knowing and willful." TCO I at 16. The record supports the court's determination based on "common sense and context." *Gross*, *supra*. Therefore, the court did not abuse its discretion in finding Father in contempt and ordering him to pay Mother $500.00 in attorney's fees.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/20/2026